Case No. 24-1099 et al., Sierra Club and Appalachian Voices Petitioners, Federal Interview Regulatory Commission. Mr. Gall for the petitioners, Mr. Shainer for the respondent, Mr. Super for the interviewee. Good morning, your honors, and may it please the court, Spencer Gall, on behalf of the petitioners, with me at counsel's table is my colleague Delaney King. I would like to reserve three minutes for rebuttal, if I may. This case challenges FERC's approval of a gas pipeline in Tennessee called the Cumberland Project. The project was proposed and justified for the sole purpose of supplying fuel to a new federal power plant called the Cumberland Gas Plant, and burning the gas that the project would transport would produce over 2.5 million tons of greenhouse gas emissions each year for decades. We're here because FERC's decision to approve the project was made without reasoned and independent consideration of its environmental and economic consequences. FERC's decision was arbitrary, capricious, and contrary to law for three primary reasons. First, as a basic violation of the ATA, FERC made and repeatedly relied on contradictory statements about the no-action alternative that rendered arbitrary FERC's belief the project would reduce downstream emissions. Second, FERC violated NEPA in part because it failed to take a hard look at downstream greenhouse gas emissions, and also in part because it failed to consider holistically the project and the Cumberland Gas Plant based on their functional interdependence. And finally, FERC violated the Natural Gas Act and the APA because it refused to engage with record evidence that the project would contribute to harm for captive electricity repayers in the region based on FERC's mistaken belief that it could not consider that evidence. Before FERC can approve a project under Section 7 of the Natural Gas Act, it's required to balance the project's harms and benefits and reach an affirmative finding that the project will be required by the public convenience and necessity. And FERC's errors in this case skewed its balancing exercise. Its arbitrary belief that the project would reduce emissions went on the benefits side of the ledger, and FERC left off the ledger entirely evidence of economic harm that should have been on its ultimate decision, based on a flawed rationale that it could not consider it. Because the balance was skewed, FERC's decision was arbitrary, and we ask that the court vacate the orders and send this case back to FERC. On your first point, and just looking at the big picture, this case just looks a lot like Citizens Action Coalition. There's a regulator, other than FERC, wants a coal plant to be retired and a gas plant to take its place, which is a good thing environmentally, and in order to do that, FERC needs to approve a small extension off an existing pipeline. And on the alternative point, we said FERC doesn't get to second-guess the generator decision, which seems like that's what you really want here, and it's just a very straightforward analysis. They need the pipeline so that the gas plant can work. Well, I agree that they need the pipeline so that the gas plant can work, although I think that there are four important distinctions between this case and Citizens Action that actually demonstrate why we win here. One of them is FERC's internal inconsistencies, which was not a factor that was present in Citizens Action, and I'll get to that in a moment because I want to address your NEPA questions directly. The first big difference between Citizens Action case and this case is that here the record does not show that coal retirement depends on the availability of a gas plant or a gas pipeline. And this is a really unusual case because TVA is an unusual utility. It's a federal utility with its own obligations under NEPA, and so we know what TVA would do absent this gas plant. It still would retire the coal plant and replace it with one of the other two options that TVA was required by law to disclose, neither of which involved a new pipeline and one of which didn't involve fossil fuels at all. If I may just briefly interject, the crediting, it seems to me the causal analysis is saying, OK, why are you crediting the pipeline or pipeline as in concert with the gas plant for relative improvements over the coal plant? But does it matter if the same crediting is being done with respect to each of the other alternatives? And as I read the record, it was. So I guess I'm not sure. I mean, I understand that some conceptual level. Your point, you know, that they say it's going to be retired. They say it's not going to be retired. You know that what is how does that actually cash out? Well, I think one of the ways that it cashes out and this goes to the inconsistencies is that not only did they flip flop about whether it would be retired or not retired and they being first description in this instance, but also in paragraph thirty three of the hearing order, you can see that FERC relied on its belief that the project would reduce downstream greenhouse gas emissions as a basis for finding that it was environmentally acceptable and therefore would be in the public convenience and necessity or at least not contrary to it. And certainly first inconsistencies are undermine that and render that conclusion arbitrary. And one reason for this is that FERC relied here on TVA's emissions analysis, which presupposed that in their no action alternative, which order you're talking about, which page of the J. The J.A. page is, I believe, pardon me, J.A. seventy three, which is paragraph thirty three of the hearing order. One of the fundamental mismatches here in the emissions analysis is simply that FERC. Treated as part of its no action alternative, the retirement of the coal plant as a state of conflict. In most cases, there were some inconsistent statements throughout that would bear on the coal plant, but mostly the inconsistencies were grounded in whether it would be replaced by a gas plant. The problem, though, is that the no action scenario in which the coal plant continues, pardon me, retires is diametrically opposed to the no action alternative that formed the baseline for the emissions analysis that FERC used. The record makes clear that FERC borrowed its emissions analysis from TVA and that TVA's no action alternative presupposed that the coal plants would continue operating absent some decision on the part of TVA. And that may have been all well and good for TVA, and I'm not here to litigate that. But the problem with it here is that FERC had a different no action baseline that formed the backbone of its environmental analysis. But I mean, I think you are re litigating it. At least implicitly. You want to call into question TVA's decision to, you love the decision to retire the coal plant. You want to call into question their decision to replace it with a gas plant. That may be true. And that's fine. But, you know, you do that challenging the TVA action, not challenging FERC's action on the pipeline. Correct. I agree with that entirely. To come back to your question about the comparison to citizens action, I submit that citizens action stands for the proposition that in this circumstance, FERC has to accurately account for what the utility will do in the no action scenario. For what? FERC has to accurately account for what the utility, TVA, will do if FERC doesn't approve the pipeline. And in the citizens action case, part of what. And if FERC, no action here means no pipeline. Not this one, not another one, just no pipeline. And FERC says if there's no pipeline, the gas plant can't work. And that defeats the purpose of this project, which is to supply gas to the gas plant. Which is a purpose that citizens action says is not unreasonably narrow. Because FERC doesn't make the generator decisions. Right. And we haven't challenged that statement of purpose and need here. Nor are we suggesting that FERC has an independent obligation to consider non-jurisdictional alternatives. Okay. If you haven't challenged the statement of need, because that does run you into citizens action. The analysis of the no action thing here is just perfectly straightforward. No pipeline, no gas plant. And that defeats the purpose of the project. That's right. But FERC's obligation under the Natural Gas Act is to approve a project only upon an affirmative finding that it will be required by the present or future public convenience and necessity. And so at least with respect to FERC's inconsistencies, FERC relied on its belief that the project would reduce emissions in the course of reaching that approval. And this is, I think, most evident in paragraph 33 in the rehearing order at JA 073. And what is important about this is not simply that there is this interplay between the gas plant and the coal plant and the pipeline. But that when FERC has to make an affirmative finding that the project is or will be required, it has to do that in a reasoned way. A Section 7 certificate confers the power of eminent domain. And members of my clients have been dragged into condemnation proceedings because their properties are in the path of this pipeline. So we submit that the least we should demand of an agency wielding that kind of authority is that its decision be internally consistent and not bedeviled by errors that we submit are present here. You had mentioned that there were four bases on which you would distinguish Citizens Action Coalition, and we've gotten you a little bit bogged down in one. If you could just lay out the other three, that would be helpful. Sure. Thank you. I think I've mentioned two of them. The first is the inconsistencies that were not present in Citizens Action and are present here. The last three relate to the NEPA sort of merits, so to speak. And one of them is that the record here does not suggest that gas availability or a gas plant at all is a necessary precondition to coal retirement. As I said, you know, TVA is a unique utility in that it has its own statutory obligation to identify alternatives that are technologically and economically feasible and capable of meeting its purpose and need. And so in this unique circumstance, we know that TVA had other options to pursue. I'm sorry. I should let you lay the mat and then I'll ask you my question. Okay. Thank you. The third reason is that unlike Citizens Action here, FERC staff made a finding that there would be no other pipeline that was capable of meeting TVA's demand for 245,040 decatherms of gas per day. And that appears in the record at JA191. The EIS finds that there's no other pipeline or pipeline company in the region capable of this. And FERC credited that finding in the certificate order at paragraph 58 at JA29 and in the rehearing order at paragraph 21, which begins on JA062. And the final reason— I'm sorry. Just what's the problem with that, just so I get what it is? One of the no-action sort of scenarios that FERC evaluated in the Citizens Action case was the likelihood that some other company would come along and build the pipeline and that the gas plant would come along anyway. And those facts aren't present here because FERC made a contrary finding that unlike that case and unlike the Alaska LNG case, there was not likely to be another pipeline that could come along. It was four of them. And the final reason is that we submit that Citizens Action was animated by concerns about federalism and overstepping a state regulator's role. And there are no federalism concerns here because TVA is an unregulated federal utility. On the second point—I mean, maybe I'm sorry if I'm repeating myself, but that just takes us back to TVA's decision. TVA is looking at options before them. One, their no-action is continue with the coal plant, which they don't like. And then they look at three alternatives. Two are gas. One is solar. And they make a decision. Like, their preferred alternative is retire coal and replace it with one plant on site as opposed to the two elsewhere. That's true. That's just—FERC takes that as a given. Well, I don't think FERC can take that as a given, though. The no-action alternative under NEPA has to account for the predictable actions that others will take if the commission doesn't act or if the agency in question doesn't act. And here, the facts are uniquely that we know what TVA would do in the no-action scenario. That's not second-guessing. If FERC had taken no action in Citizens Action, there would be no pipeline and there could be no gas plant. And the coal plant would have to keep running or they'd have to come up with some other solar or other alternative. And our answer to that was that FERC doesn't get to second-guess the generation decisions of another regulator. I think there are two important differences. One is that in Citizens Action, FERC found that another pipeline could come along and supply this gas plant. And so— That's your third point. That is my third. Yeah, it's related to my third point. But I think it's important here— I guess I'm just not sure. I'm not sure what the relevance of that is. I mean, FERC here has the proposed alternative, which is, whatever, 32 miles off Tennessee gas. And then they look at alternative facilities and alternative routes, and they say this is the best one. That's right. But an agency's obligation under NEPA is to account for the predictable actions that others will take if they take no action. And this is congruent with the court's discussion in the Citizens Action opinion. And what we propose is that on this record, it's clear that this coal plant is retiring anyway. And unlike Citizens Action, we're not asking FERC to sort of re-examine the other alternatives that a utility could choose. We're simply asking it to take TVA at its word about what would happen here. And the final point I really want to make on this— I mean, what about TVA's decision-making process makes you think that they didn't? I mean, TVA is the source, I think, of FERC's assumption that the coal plant was going to be retired. So whether you think of it as the coal plant retirement as causing each of the alternatives that TVA thought about or as independent, the different alternatives got, first of all, beyond—you know, bracketing was beyond the scope of what FERC's considering. If each of those different—like, if the causation is attributed equally, causation of the closing of the coal plant is considered equally with respect to any other alternative generation system, how does that skew the balancing and the public interest determination that FERC made here? Well, we don't think that the causation principles and the facts that are present here allow FERC to attribute to this gas pipeline the retirement of the aging coal plant. I understand that, but what I'm saying is, assuming that was error, the TVA also attributed the benefit of retiring the coal plant to other alternatives that were before it. And so when you look at the environmental offset, it's even higher from some of the other alternatives. So it's not like that decision-making was skewed. You know, you could net out the coal plant from all of the alternatives, and then, relatively speaking, they would have, you know, similar degrees of advantage or disadvantage. So I guess I'm not understanding what your argument is about how that bears on the decision before FERC. Well, I think it bears on the decision before FERC for two reasons. And one of them, not to retread, is that we don't think causation principles allow FERC to find a decrease here, and FERC relied on a decrease in making its decision. The second is that FERC's review of this project and the gas plant vis-a-vis the alternative options that TVA would pursue in the no-action scenario. And again, I want to be clear, we're not suggesting that FERC can reimagine other alternatives beyond those that were before TVA. But FERC's cramped review and taking simply TVA's record of decision, which came before as a fait accompli, left FERC without a comparative basis to evaluate the differences that you're talking about here, Judge Pillard. So the court's many-think decision identifies that the Natural Gas Act requires some analysis of alternatives beyond just the application that is before the commission. And here, we think that if FERC had had a sort of a fulsome understanding of the alternatives in question and what TVA would do in the no-action scenario, its analysis would have revealed that this pipeline actually came with a tremendous opportunity cost. And that's part of, we think, why it matters. There is a separate discussion here as well about the economic considerations, but I see that I'm out of time. Can we ask about the economic considerations? And I have questions for FERC about this. Am I right that when one considers precedent agreements, in part, one wants to look at whether there's market need? And as I understand it, the market need inquiry is about protecting rate payers from being saddled with costs that aren't shown to be going to be paid by others as opposed to the captive rate payers. And I guess I don't really understand how, I don't think this is an argument you've particularly made, but how precedent agreement where there were no other bidders, there's no other market. I mean, as Judge Katcha said, everybody, it's pretty straightforward. There's going to be a gas plant. It's going to need this pipeline. It's unlike where you have a pipeline going into a pipeline system and there are shippers that need more capacity and they're willing to pay for it. I mean, this is a dedicated project. What's your understanding of precedent agreement and what role it plays? So I think what's important here is that FERC credited the precedent agreement as dispositive on the question of market need and public benefit. And I agree that this is an unusual situation with respect to need in the sort of no subsidy vein. But what's important here is that the precedent agreement was bedeviled by errors because it flowed from a process that was uneconomic and had its own inconsistencies and problems. And so as an indicator of public benefit in particular, we think the precedent agreement lacked probative value and that FERC failed to confront evidence and argument that would have undermined or should have raised red flags. Can you be more concrete? What is the problem? What harm is caused to whom? Why? The problem here is that the TVA decision to build the gas plant was predicated on problems. And the record before FERC contained evidence from EPA and others documenting concerns that the gas plant was approved on the basis of inaccurate underlying economic information and perhaps most problematically ignored $860 million worth of tax credits that would have accrued to captive electricity rate payers in the region. And we submit that FERC's authority under Section 7 encompasses public interest factors like consumer cost beyond its direct regulatory jurisdiction as this court identified in the Office of Consumer Counsel case. And that its power to weigh the public interest and its corresponding statutory obligation to do that gave FERC no ability to avoid confronting this evidence on jurisdictional grounds. Now, whatever other things FERC might have said about this evidence is not in question in this case because FERC wrongly believed that it could not consider it. Why wasn't that really information for TVA to consider as opposed to for FERC? Because really it comes to FERC that TVA has looked at the array of options and made its choices and should have probably considered those benefits. I think it's information for both of them to consider. Nothing about the Natural Gas Act or the TVA Act or any other provision of law that any party in this case has identified would suggest that Congress intended for FERC to be a sidekick to TVA. So I grant you that TVA had its own decision to make and that we may have gripes with that that are better litigated elsewhere. But FERC had an independent obligation to discharge its responsibilities under Section 7 of the Natural Gas Act. And for that reason, it couldn't simply turn a blind eye to this evidence. And what should it have done if it properly took account of those subsidies? Where would it take account of them and what would it have done? Well, again, I want to be clear, we're not arguing that this precedent agreement means that existing customers of the Tennessee gas pipeline lateral will subsidize this. The problem accrues to captive electricity rate payers in the region. And what FERC should have done is confront this evidence and it could have come up with reasons to weigh it but not give it this positive weight or not credit it at all. I mean, it's possible for you to imagine a variety of scenarios in which an agency could make a reasoned decision that didn't treat this kind of evidence as dispositive. But it's not reasoned for FERC to simply refuse to confront it at all. The decision you just made was it's captive rate payers will pay for it, not... Captive electricity rate payers will pay for it, not captive rate payers that are in a sort of downstream of a pipeline vis-a-vis a local distribution company or something like that. Like the facts in the Spire case or the New Jersey Conservation Foundation case. And you made an argument about connected action. Why in the end does that matter? If the same downstream consequences are calculated under the rubric of connected...  Cumulative. Thank you. Cumulative effects. The information is out there. It's maybe not packaged entirely correctly, but what materially in terms of decision-making, distortion or the like, what difference does it make whether FERC improperly failed to see these as connected actions? I think there are two elements of prejudice to this. And one relates to this cumulative effects concept that you raised. In this case, cumulative effects doesn't ameliorate the prejudice. It just illustrates FERC taking a side on... Or I should say illustrates one example of FERC's inconsistencies about the no action alternative. Because treating the gas plant and the corresponding effects from it as a past, present or reasonably foreseeable future action presupposes that they will occur. And this is one of the things that FERC was internally inconsistent about. Why does it depend on connectedness or not? Well, we don't think it depends on connectedness. But that was my question. I'm sorry. I may have misunderstood. Can you... Why is it material? Assuming FERC made an error in failing to see the plant and the pipeline as connected actions, why is that material to the decision that we're reviewing? Understood. It's material, I think, in two ways. One way is that it is... That failure is directly responsible for FERC's confusion about the no action alternative. And on this question, I actually think that the lead agency regulation discussion, separate from the connected actions regulation, is really illustrative. Because to the extent that FERC felt confusion about what TVA would do in the no action scenario, FERC has only itself to blame for not initiating a cooperative process with a broader scope of review and simply asking that question at TVA. And the second question goes to something that you raised a few minutes ago, which is the sort of comparative benefits of all of the action alternatives that were before TVA. If FERC's review had been properly scoped and had accounted for the functional interdependence of the pipeline and the gas plant, it would have observed the opportunity cost from the perspective of emissions that building this option would have brought about versus building something like the alternative C that TVA studied, which was the solar storage option. I'm not following that because it did calculate effectively the same emissions under the rubric of tubulative effects as opposed to the effects of a connected action. And therefore, it weighed those. And it could see that there would be way less environmental harm from some of the other options. So it knew that when it made the choice. It did know that when it made the choice. But treating these, as I said, as cumulative presupposes that they will occur. And part of what's gone wrong here is simply that FERC didn't take a side on what would happen if it didn't approve this pipeline. So you gave two reasons when Judge Pillard asked why any mistake on the connected action question would be material. Let's say that we disagree with those two reasons. It seems like then at that point, any connected action mistake would be harmless. Do you concede that? Well, I wouldn't concede that the connected actions mistake is harmless because I think it's directly responsible for the confusion that FERC had below and the cramped scope of alternatives. But netting out those two options. Let's say we don't agree with you that there was important confusion. Let's say we don't agree with you that there was a cramped scope below. Then, yes, I agree that that would be harmless in those circumstances, Judge Walker. I appreciate that. And then if I could go back to your discussion about the precedent agreement. I'm just wondering if there's any core decision that does what you're asking us to do. As I understand it, what you're asking us to do is say that the precedent agreement is not enough to show economic need. And I understand that the court has sometimes said that a precedent agreement is not enough when there's evidence of self-dealing. But outside of the self-dealing context, has the court ever said that precedent agreement is not enough to show economic need? The two cases that I'm aware of are the Spire case, Environmental Defense Fund, which is the sort of seminal self-dealing case, and the New Jersey Conservation Foundation case. First one sounds like it's self-dealing. I agree. And I don't think that New Jersey Conservation Foundation is self-dealing in the sense that it involved self-dealing or improper motive on the part of the pipeline company. What was concerning in the New Jersey Conservation Foundation case was that the local distribution companies were operating in a way that had a market incentive for them to enter precedent agreements that, as far as the transportation company, the pipeline company was concerned, were perfectly fine. But that they had this backdrop motive where they could reprocess at the expense of their captive rate. That's not the context here. No, I agree. So outside that context, I'm not aware of a case that does this. But we think this is simply a fact-specific application of those principles, which is that when FERC is confronted with this evidence, it ultimately has to respond with a non-arbitrary reason. And here we think that FERC's rationale, which was that simply it could not inquire into this evidence, was not reasoned. Fair enough. I wonder, if you had to guess, in the past 10 years, how many final environmental impact statements have been done for natural gas pipelines? Your Honor, I'm not even sure I would get close to the bullseye. I would agree it would be more than 100. In the past 10 years? More than 100. NEPA documents environmental impact statements and environmental assessments together.  For purposes of this argument, I can say more than 100 sounds right. I don't want to. I won't hold you to it. What I'm wondering is whether it's more than 100 or less than 100. Can you point to any of those environmental impact statements that you think were adequate? Not off the top of my head, Your Honor. Unless the Court has any further questions. Can I just take you back to inconsistency? Yes. I look at the discussion of no action, no action alternative, and it seems fine to me for reasons we've discussed. You say, well, yes, but there's a separate issue of internal inconsistency. So I want to make sure I understand it. As I understand it, the main inconsistency you see is between the sentence in the rehearing order, the sentence of paragraph 19. If the commission selects the no action alternative, the Cumberland project facilities would not be constructed, the potential impacts from TVA's construction and operation of the gas plant would not occur, and the project's objectives would not be met. That sentence versus a sentence in paragraph 63, which is the discussion of interconnectedness, in which FERC says TVA will retire the fossil plant and construct and operate the gas plant with or without the Cumberland project. Is that, do I have that right? I think that that is the most flagrant example of the inconsistencies, and so it's one that got a lot of airtime in our brief, but there are other inconsistencies. Because when I parsed it, and maybe one shouldn't read agency orders as if they were statutes, but when I parsed it, I thought they were reconcilable because the first statement effectively says no pipeline, supply gas, no gas plant. Objectives of the project are defeated, and the second one says TVA will go forward with or without the Cumberland project, which is this pipeline. This is in the context of discussing, what's the term? Independent utility. They're saying the gas plant has independent utility because if they don't build this pipeline, someone will build another one. Those seem to me not inconsistent. What do I have wrong? Well, I think it's inconsistent to say they will build this pipeline, pardon me, they will build this gas plant and operate it with or without this pipeline because someone will build another one. That to me is inconsistent from the discussion in paragraph 19 that says if we choose the no action alternative, the potential impacts from the construction and operation would not occur. No action is a term of art, which in the CIS means not this pipeline, not any pipeline, not any other pipeline. I think in circumstances where the predictable actions of others could include the development of another pipeline, as well as the case in citizens action, maybe the answer would be different. But here, FERC found in the EIS, I believe at JA191, that there is no other pipeline that's capable of meeting this need. After looking at system alternatives and route alternatives. After looking at system alternatives and route alternatives, that's right, and looking at the capacity on the other systems, the other pipeline systems, A&R and ET&G that were available in the region, FERC staff concluded and FERC accredited that none of those other systems could supply this volume of gas. So this isn't a situation where someone else is going to come along and build this pipeline. Okay, thank you. Thank you. We'll give you a little bit of time for rebuttal, even though we kept you over. Thank you, Your Honor. Morning, Your Honors. May it please the court. Houston Shaner for the Federal Regulatory Commission. And Judge Katsas, I'd like to begin with this inconsistency. I think you hit the nail on the head here. In fact, the scope of the inconsistency is much smaller. While it is generally paragraph 19 versus paragraph 63, it's really only one phrase in paragraph 63. Namely, the potential impacts from TVA's construction and operation of the Cumberland gas plant would not occur. Do you agree with my determination of the two statements? To some degree, yes. It took me a while. There is, to some degree, I would say, this statement in paragraph 19 is a characterization of the commission's downstream effects analysis. That is, to some degree, inadvertent. But this is not where the core effects analysis is taking place. And my colleague on the other side, while he's certainly familiar with the record and very eloquent, we had no discussion of the actual substance of downstream effects analysis, which is found in an entirely different part of the hearing order, namely paragraphs 39 to 42. That's the core of this. The blue brief also tries to style the no-action alternative argument as one about the downstream effects. But that effects analysis, again, simply does not hinge on these sort of 11 words. And I think it's also important to walk through the entire no-action alternative section and really the rest of the order to understand that this one phrase is not any sort of fatal inconsistency. And the context makes clear exactly what the commission was doing and why that was coded. In fact, actually, if you start at paragraph 18 beforehand, you will see in the last sentence, this is JA-61, the commission says an agency does not err by rejecting a no-action alternative that would not fulfill the project's purpose. You then proceed to paragraph 19, and nearly every word of this, other than the phrase to which they latch, is about why the no-action alternative, namely rejecting the project, would not fulfill the project's purpose and need, namely supplying the gas plant. So it's clear that under cases like Center for Biological Diversity, the commission had good grounds to reject a no-action alternative, and this phrase is not central to that. If I'm following this, just one more level of complication, which is apart from the 19 versus 63 issue, there's a garbling within 19 that the text accompanying note 56 is a little bit of a misquote from the EIS. But I'm not sure it matters, because the general thrust of 17 through 22 is pretty clear, which is no pipeline, gas plant can't run, project purpose defeated. Yes, and I think we'll get to the downstream effects, there are some other questions there, but to answer your original question, that is correct. There's a slight inadvertent mischaracterization of the term proposed action in the impact statement, but that is not the linchpin of any part of the commission's analysis, including the no-action alternative. I think it's also important to understand what the commission was doing here, to get the context, more further context of the no-action alternative, in the next two paragraphs. In paragraphs 20 and 21, the commission says, more than once, it is speculative to determine what other actions TVA might explore to serve its need for additional firm transportation and gas supply. That includes not only other possible pipelines, some of which may not exist yet, or even be planned, or what TVA would have done absent the gas plant. So the commission is not making a determination whether or not necessarily the TVA would abandon the gas plant. They're saying we're taking the gas plant as a given, and we're taking TVA's decision as a given, and our effects analysis will launch off of that. I'm sorry, I think it's your sentence, I didn't mean to interrupt you. The opening briefs has not challenged the commission's determinations in paragraphs 20 and 21, and it's, I think, very important to understand why the commission refused to speculate here. As we note in paragraph 20, it's outside the scope of our jurisdiction to try to re-litigate these issues, Judge Gatch, as you mentioned, because to determine what alternatives TVA would pursue, whether that's another pipeline or another downstream generation option, means we have to replicate the entirety of TVA's least-cost system minimization and planning analysis, which is an incredibly complex portfolio-wide endeavor that's not involved just the gas plant. It involves things like operational risk, dispatchability, reliability, dependability of the plants, other costs, direct outlays, and as my friend also mentioned, and it really is this petitioner's want, they want us to put more emphasis on what he calls the opportunity cost of emissions. But TVA has its own analysis, including a lifecycle analysis across its entire portfolio, and the commission is neither equipped for that, but more importantly, Congress, as Citizen Action tells us, explicitly prohibited the commission from trying to regulate downstream generation in this way. I would also note in passing, my friend mentioned that, or claimed that Citizen Action is limited to incursion on state jurisdiction. That's not true if you look at the text of section 824B1. It simply says the commission has no jurisdiction over generation fully. And you also see some cases like ANR Pipeline that say we may not intrude on another agency's regulatory authority where they have direct voice in downstream uses. It seems like it's factually distinguishable and materialized from all of those cases, and it puts everybody in a spot to deal with something novel. But I'm not following why a precedent agreement shows that costs are not being put on existing customers. Was there any entity other than TVA that bid during the open season process that's referenced in the record? I'm not aware of one. I may have to defer to Intervenor Council on that. They would have a better understanding of events that may have often happened before the commission's record. Although it's FERC's burden to show that there was market need, right? Yes. And here, there's no question that there's actual demand and market need for the pipeline. There is a gas plant downstream that's being constructed. TVA had already decided and selected the gas plant by the time of the commission's decision. So, it's simply beyond dispute that there is demand and market need. The real question here is whether or not the commission thinks that the type of need downstream, particularly the type of generation resource, is bad as a policy matter and should attempt to veto that. And we're told already by ANR Pipeline that we should not do that. Right. As long as citizens act. Why analyze the precedent agreement at all? It seems like really at the heart of your analysis is TVA does planning. It makes decisions. We have no role in second-guessing them. So, if it says it wants to build a gas plant and that it needs pipeline to serve it, end of story. Why is that not the analysis? I'm just trying to understand. That is largely the analysis. I'm crediting the open season and the existence of a precedent agreement, which seems to me a performative formality. Is that wrong? Well, it's not a formality. There's something about it that shows that there was competition, that there is some kind of, you know, somebody who could have gotten the delivery elsewise is choosing this as the cheapest way to get it. The Commission's Certificate Policy Statement, which this Court has affirmed in many cases, it's from Commission's application in many cases, says that we will take, says that precedent agreements are important evidence of market need. And that is important to the Commission's overall benefit balancing analysis. It's only one part of it. We look at a project… It bears not at all here. Am I wrong? That's what I'm trying to get your… No, it's quite clear that there is a social benefit to the pipeline because there is market need for the pipeline. Project need, there is demand. And that's also relevant, by the way, to the pipelines, you know, if they have other certain types of customers. The Commission also looks at rates, rate effects of the pipeline, how they structure their rates or their incremental rates. Are they spreading it up to, are they spreading costs to other customers who may already exist? And that can be important with the precedent agreement too. But it's black letter law that precedent agreements are important evidence of project need and benefit under the Natural Gas Act and thus substantial evidence of that. And that's all we need here. As Judge Walker alluded to, there are cases in which the Commission might look behind or needs to look behind the precedent agreement, but those exceptions are vanishingly small. Like in EDF Spire, the Vermont Oceans Fund case, there were two affiliated entities, the purchaser and the pipeline company, who had sort of, you know, essentially some version of self-dealing. No one disputes that that's not the case. No one claims that's the case here. And in New Jersey Conservation Foundation, there were, you know, the court ultimately held that there were some concerns about how the local distribution companies would use the gas or what their motives were. But that's not relevant here at all because there's no downstream local distribution company buying this. And importantly, there's nothing like, this case is much more like citizen's action where we have an explicit statutory prohibition on trying to regulate downstream generation in terms of its use of the gas. The difficulty is that it's FERC's responsibility to make sure that burdens aren't being placed, you know, that avoidable burdens, excess burdens aren't being placed on existing rate payers. And the petitions here point to the absence of a state regulator that is focused on that. And your brief says, oh, but it's congressionally regulated, but not for this issue, not for existing customer overpayment. And the precedent agreement doesn't really seem to speak to it. We have a distinctive monopoly TVA here, federal entity. And I guess, so I guess in my view, what I would expect to see in FERC's order is some explanation why, you know, how FERC can discharge its obligation. And TVA is sitting pretty, I mean, I'm being contentious. Well, it's the scope of the obligation. That TVA says, well, we're going to do a portfolio of generation types, and this is one of them. And the question for FERC on behalf of the rate payers is, well, why should we be confident that that integrated planning process thought about rate payers with respect to this gas plant and the pipeline that serves it? I think that's your obligation, is it not? As explained in paragraphs 14 and 15 of the hearing order, and also paragraph 15 of the certificate order, Congress has said that that decision is made by TVA, and we are not to intrude on it. So why doesn't the order say we have no role in looking at market need or looking at costs to rate payers of TVA? Because that is TVA's responsibility. It's outside our jurisdiction. TVA did its integrated planning process, and we've got nothing more to say. I think most simply, we need to make sure that the pipeline company isn't going to build a pipeline that it quickly abandons. We need to make sure that the pipeline company will not build a pipeline that it immediately abandons. The relevance of immediately abandons, I'm sorry, if you can't hear me. The critical issue here really is, is there demand for the pipeline itself? We're looking at that. That's true. And this is really more relevant to the pipeline company. Is their project going to be self-sustaining? Is there an economic motive for the project? But we know that here, and that's not in dispute. If you may also, I would like to quickly touch on the downturn effects analysis, because I believe this is also quite important. My friend claims that there is no evidence that the retirement of the coal plant depends on replacement. I respectfully disagree. That is simply counterfactual. TVA's record of decision from GA 348 to 351 entertains a no-action alternative, including continued operation of the coal units past the point of decision. So TVA was considering retirement up to the point where it selected alternative A, which is the gas plant. Now, TVA does not tell us in record of decision what the second option would be, and one reason why the commission refused to speculate here. We do not know what TVA would do absent alternative A, because they simply have not told us. But the record is also clear, not only in record of decision, but in the commission's impact statement at GA 190, and also even from decisions like even on Blu-ray, page 29, you'll see the commission's opinion in Kern River. They point out there the commission looked to statements saying that the coal plant would continue to operate. If you also look at GA 417, appendix B to the TVA impact statement, you will see the exact same language. Without the gas plant, TVA will be forced to operate the coal units to some degree. Maybe not permanently. We're not certain of that. There's also simply no evidence in the record that TVA fully committed before the record of decision to retire the coal plant. Now, in paragraphs 40 to 42, the commission does recognize that TVA had already decided to both retire the coal plant and replace it with the gas plant. That's not a problem for downstream effects analysis, because citizens' action tells us that the practical reality of these situations is that the large downstream infrastructure projects are the dog that wags the tail. It's not the pipeline. Something like a gas plant is almost always decided before the pipeline gets approved and built. To recognize downstream effects analysis and apply a stable trail, we simply have to take that decision as a given and understand that we're supplying fuels to those entities. Assuming that you can net out for savings from retiring coal plant, what's the justification for extending that 20 years? I thought I saw some indication in the record that, apart from any question of replacement, that those coal plants were very old, nearing the end of their useful life, and no matter what happens, they wouldn't last beyond 2035. There are suggestions in the record that TVA might like to retire some of its coal units by 2035, but there is no hard and fast commitment, and TVA notes at JA190, I'm sorry, this is the commission's impact statement, but in more detail at JA365, the TVA impact statement, that these are not hard and fast commitments. I'm sorry, where are you? I'm sorry, JA365. Which is what document? This is the TVA impact statement. Got it. TVA made the decision in 2019 that on January 1st, 2035, they were going to switch off every coal plant across the entire system, come what may, at the risk of something like blackouts. Those retirements depend on generation. The retirement of coal unit one at the Cumberland facility specifically depends on TVA's approval at the gas plant and the record of decision. In fact, the JA citations I just gave you indicate that TVA's overall plan, as referenced in the IRP, has sort of soft target goals. It's high-level portfolio mixes. They depend on getting all of these retirements to go correctly in sequence without delay. Of course, but the question really is, assuming there's going to be something picking up the slack here, the gas plant, why would we assume in addressing the sort of, in establishing a baseline against which the benefits of the gas plant are measured, that there would be 20 years as opposed to the, I mean, you know, all the planning as opposed to 10 or less? TVA is saying, you know, ideally, assuming we have a replacement, which we have, we're going to retire this. Maybe even sooner. I think one of the reasons they chose gas over some of the other alternatives is because they could get it online quickly. And that means the prospects for retiring the coal plant were more prompt, no? Well, it's quite possible the TVA, without the gas plant, would continue to operate the coal plants indefinitely. As explained in the record of the decision, there's no actual alternative. That's not the situation. The situation is, assuming the gas plant comes on, what is the appropriate offset? And I had to share Judge Katz's question with the, assuming that there's an offset, why would it go on indefinitely? That doesn't make sense. So the gas plant has a 20-year contract. That's the precedent agreement. And the commission used that as the best measuring stick we have, because we have no crystal ball in inquiry. We don't know for certain what's going to happen in 2035. That's a great argument for not extending gas emissions more than 20 years. I'm not sure it's an argument. That's correct. Well, what we're really, what we're really asking then, if I understand Judge Pogue's question correctly, is why are we not assuming that the coal plant will retire at some specific date? And that is simply because TVA. I mean, you say, you know, there's no hard and fast, but there's a good understanding of the reasonable life of the plant. I would disagree on that. My friend likes to allude to certain statements in the record, but they're simply planning assumptions. And as Judge Sutton tells us in Kentucky Coal Association, and if you just read the basic language in the TVA's 2019 integrated resource plan, there is no firm commitment to retire the coal plant at a certain date. And part of that is because TVA has an incredibly complex analysis. They need to get an important time to conduct its least cost system planning, because those different units depend on the state of the system at any one time. Also, keep in mind, they're drawing on statements from the 2019 IRP, integrated resource plan. That plan gets updated roughly every four years. So there will be a new one. I believe there already was a new one issued in 2023, a new one in 2027, a new one in 2031, a new one in 2035. There is no guarantee that TVA's retirement target dates continue out to that point. If you look at the record of decision, specifically when TVA's record decision at GA349 discusses the new action alternative, you'll see that they'll have to make large investments to keep the coal plant running. But that actually may be a reason to keep the coal plant running if they sink a bunch of costs into it. Otherwise, they have stranded assets on this coal plant. Can you point to anything in the IRP, the IRP process that provides the assurance that I was looking for that the lowest cost to rate payers is guaranteed or is weighted appropriately? So the record of decision describes alternative A as the best overall solution. And that is across a wide variety of costs. So costs in TVA's sense do not necessarily include direct outlays or direct payments by downstream rate payers. They also include social costs, like environmental costs or indirect costs, and also risks, including risks to the system. And looking at all of that together, the sort of multifactorial analysis, TVA concluded that alternative A is best for everyone in its under-serviced territory over the long term. And that is such a complex endeavor. It's not one that Congress has said is committed to TVA's discretion only. The Commission has no role to do that, whether it's under the Natural Gas Section 7 analysis, Connected Actions Doctrine, or the Downstream Effects Analysis, or the No Action Alternative. And that principle largely resolves most of the claims in this case. I see I'm out of time. If I can't answer any questions, I'd be really happy to do so. Thank you. David Super on behalf of the intervenors. I think I'd like to start on the precedent agreement issue. And Judge Walker, you're exactly correct. There's no case from this court that comes even close to supporting the argument that Sierra Club is making here, that this precedent agreement, that the court should look behind the precedent agreement as a showing of market need. And Judge Pillard, I think there might be a slight conflation between the market need for the gas plant and the market need for the pipeline. The precedent agreement is relied upon as evidence of the market need for the pipeline only. It's a 100% commitment, full capacity, all the gas that will be shipped via that pipeline will go to the new gas plant. And that is a full showing of market need. And I think it's important to point out that while Sierra Club purports to be looking out for the interests of the customers, the customers here are actually represented in this case. The Tennessee Valley Public Power Association, they are the customers of TVA. We're talking about 153 consumer-owned and community-owned local power companies, that they are the customers and they are fully supportive of this pipeline. And that was reflected by FERC in their certificate order in footnote 15 on JA 5 and 6. And is there any control on what the local power companies can charge the end users? Well, the local power companies, well, the entire TVA approach, of course, is regulated by Congress. TVA has a statutory mandate to provide least cost services. Now, there's no allegation in this case that the local power companies that are customers of TVA are not providing fair and reasonable rates to their customers. Sierra Club hasn't even alleged that. So this is not a case like the New Jersey conservation case, where there's any kind of allegation of customers not being given a fair deal. Well, there is in the sense that I think what the petitioners here are claiming is that had the analysis been done more fully, that there were other alternatives that would have been cheaper for the ultimate rate pairs. But again, that's... What I'm curious about is, I agree with you that it appears in the situation with TVA that the buck kind of stops with the integrated planning. Plan. Integrated resource plan. Integrated resource plan. So it seems sort of a little window dressing to say, oh, and there was a precedent agreement. Of course there was, because it was planned to meet the needs of this plant, right? So it doesn't seem to me that that is showing anything other than what's already the case, which is that there's an underlying planning process that landed on, among a portfolio of generation facilities, that landed on a gas plant as an appropriate one. Right. I mean, two thoughts. From the standpoint of market need for the pipeline, I think it simply shows that this is a very easy case that there was market need via the precedent agreement. When we get rationales that don't... I know they're applying their policy statement, but it's helpful for Ford to have more of a, like, does it make sense kind of reasoning. And to me, that doesn't really make sense. Understood. I think the real disconnect with Sierra Club's argument is that they truly are attacking TVA's decision to replace the retired coal unit with a gas plant. And that is entirely beyond FERC's jurisdiction. FERC has no jurisdiction whatsoever over that decision. Congress left that decision in the hands of TVA. And indeed, Sierra Club and other plaintiffs are challenging that decision in the Middle District of Tennessee in a case that was filed 18 months ago, I believe. I see I'm out of time, unless there are any questions. It's odd because it is FERC's obligation to think about whether rate payers are kind of sitting ducks and going to be overcharged. And it seems like in this situation, it's not clear why they're not, except to the extent that their interests are kind of generally folded in to the TVA IRP. But it's hard to pinpoint anything that kind of documents and really substantiates how that happened. And again, that's done. I think the comfort we can take is that Congress, through the TVA Act, directed TVA to make those determinations. And FERC simply has no jurisdiction to second-guess the determinations that TVA makes. Thank you. All right. There was some reservation of time for rebuttal. Three minutes. Thank you, Your Honors. I'd like to start with this question about the 2035 retirement deadline. FERC has suggested that we need to come forward with some evidence that TVA had affirmatively and firmly committed to a retirement by 2035 before there would be some analytical problem with their extrapolation of offsets for 20 years. That flips the burden of recent decision-making on its head. The simple fact is that there is nothing in this record, save for TVA's discussion of the no-action alternative in its process, which was continued operation of coal, from which FERC could conclude that the offsets should persist beyond 2035. In all events, even as TVA's system is a fleet-wide question about coal retirement following the 2019 IRP and the aging coal fleet evaluation, the J.A. at page 65, footnote 1, which is a part of TVA's final environmental impact statement, indicates that these units are the ones that are going first. So there is simply no way for FERC to have rationally concluded that this particular coal plant would operate through 2035 or beyond. And if they had looked for that evidence, they would not have located it. All of that... Sorry, what's the... Put aside the question of who bears the burden of justification. Assume I just want to look through the record and figure out what's in there about whether these plants would have to stop in 10 years regardless. What's the best you have on that? I would refer you to J.A. I've got a couple for you, Your Honor. I would refer you to J.A. 365, which is part of TVA... 365, that's right. This is TVA's final environmental impact statement, and it identifies the phased 2035 retirement plans for the entire coal fleet. It illustrates that coal is too risky for TVA and that this plant in particular, the Cumberland Fossil Plant, which is sometimes abbreviated as CUF in the materials, is a significant contributor to fleet-wide risk. And that in footnote one, that even if replacement capacity for CUF, the Cumberland Fossil Plant, is delayed, that's still the coal plant that is going to retire first in all of TVA's phased coal retirements. I would also point you to J.A. 348, which is TVA's record of decision. This discusses that coal end-of-life planning came after the 2019 IRP and came out of the 2019 IRP. And so to the extent that the IRP anticipates continued operation of some or all of these coal units, it's simply because TVA followed that up with a study in which it said, as a matter of fact, we can't continue to operate all of these indefinitely. We need to have a plan in place to retire them. And we pointed in our brief to the aging coal fleet evaluation, which is included in the joint appendix at 445. This is the aging coal fleet study that came out of the IRP, and it illustrates at page 445 that even in the most conservative coal extended scenario, the CUF units are fully retired by 2031. And this is a two-unit coal plant, and one of the units is going to go a few years before the other one. So had FERC looked, it could not have located evidence that the coal plant would continue to operate past 2035. I see that I'm over time. So unless the court has other questions,  Any response to the accusation that what you're raising here really belongs in the Tennessee case? I do. And I think it points to the ANR pipeline case that my colleague on the other side mentioned. This is not a circumstance where we are asking FERC to exercise jurisdiction that Congress has assigned to another agency. This is a circumstance where we are asking FERC to exercise its own jurisdiction, not as a subordinate to TVA, but as an independent agency with its own set of obligations to consider all factors bearing on the public interest, which this court and the Supreme Court have held, extend to matters beyond FERC's direct regulatory jurisdiction. And so whatever else FERC might have said about the weight it assigned to TVA's decisional process or the extent to which it found it compelling, it was not reason for FERC to say that it could not inquire just because TVA is the shooter. Thank you. Sorry. You mentioned JA 445. And there are some references to 2040, not 2035. Yeah, not 2035. From what I can tell, it looks like it's saying 2035 would be better. So maybe that's your point. But if it's imagining that the retirement might happen in 2040, how is it proof that the retirement will definitely happen in 2035? So looking at the 2045, I think it's a row. In the columns that illustrate the different years in that scenario, CUF 1 and CUF 2 are listed for retirement no later than 2031. And so when we're talking about this specific coal plant, as opposed to TVA's coal fleet writ large, we submit that this page supports the principle that it would have had to retire before 2035. And it matters for the reason that is illustrated on page 35 of our opening brief, which is that even if TVA had, pardon me, even if FERC had appropriately credited the project for a decade of emissions offsets, the number would still be an increase on net in downstream emissions and not a decrease as FERC believed. Sorry, the plants we're talking about are CUF 1 and 2. That's correct. So they're the same plant, and then those are just two of the different coal generating units at that facility, Your Honor. If you have any questions, we would ask that you vacate the orders and grant the petitions. Thank you. The case is submitted. Thank you.
judges: Pillard; Katsas; Walker